**MORGAN, STRAND, WHEELER & BIGGS d/b/a Tucson Radiology, an Arizona partnership; West Coast Radiology, Inc.; Karl H. Morgan, M.D., an individual; Richard D. Strand, M.D., an individual; and Lee E. Taylor, M.D., an individual, Plaintiffs–Appellants,**

v.

**RADIOLOGY, LTD., an Arizona partnership; HCA Health Services of Arizona, Inc., an Arizona corporation; Hospital Corporation of America, a Tennessee corporation; Hospital Corporation of Arizona, an Arizona corporation d/b/a El Dorado Hospital, Defendants–Appellees.**

No. 89–15022.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 16, 1990.

Decided Feb. 1, 1991.

Andrew Laidlaw, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for plaintiffs-appellants.

H. Michael Clyde, Brown & Bain; Randall S. Yavitz, Sacks, Tierney, Kasen & Kerrick (James A. Craft, Evans, Kitchel & Jenckes, on the brief), Phoenix, Ariz., for defendants-appellees.

Before TANG and BEEZER, Circuit Judges, and STEPHENS,* District Judge.

TANG, Circuit Judge:

Plaintiffs-appellants (hereafter all referred to as "MSW & B") are radiologists and radiology groups. Plaintiff-appellant Morgan, Strand, Wheeler & Biggs, d/b/a Tucson Radiology, is an Arizona partnership that began providing radiology services in Tucson, Arizona starting in 1980. Its partners include plaintiffs-appellants Doctors Strand and Morgan. Plaintiff-appellant West Coast Radiology, Inc., a California professional corporation, provided radiology services to plaintiff Tucson Radiology. West Coast Radiology employs Doctors Strand and Morgan, as well as plaintiff-appellant Doctor Taylor, all of whom hold shares in it. All plaintiff-appellant physicians except Dr. Taylor started practicing radiology in Tucson in 1980. Dr. Taylor was a RL radiologist before he joined West Coast Radiology.

Defendants-appellees are a radiology group, Radiology, Ltd. (hereafter "RL"), a hospital, Northwest Hospital, and the hospital's owner, Hospital Corporation of America (hereafter "HCA"). RL is a professional corporation that provides radiology services in Tucson, Arizona.

MSW & B appeals the district court's summary judgment in all but one of their claims. They alleged violations of section 1 of the Sherman Act, 15 U.S.C. § 1, through exclusive service contracts, group boycott, and collective refusal to deal, and of section 2, 15 U.S.C. § 2, by monopolization, attempted monopolization, and conspiracy to monopolize. They claim that RL and HCA unfairly and illegally contracted exclusively to MSW & B's detriment, and even though MSW & B assiduously sought that contract.

## BACKGROUND

Radiologists are physicians who specialize in interpreting medical images. Medical images include the traditional x-ray films and contrast material studies, flouroscopy, cineradiography, ultrasound, and radionucleide (nuclear medicine), computerized axial tomography (CAT), nuclear magnetic resonance (NMR), and positron emission tomography (PET) scans. Both radiologists and nonradiologist physicians interpret the images. Physicians who care directly for patients are the ones who order imaging. These same physicians may interpret the images, especially the more common x-ray studies. For example, cardiologists may, without consulting a radiologist, obtain and interpret coronary arteriograms, cineangiograms, and echocardiograms. A general practitioner may obtain conventional x-rays for examining the chest or an injured extremity. Technicians usually operate the equipment that obtains

* Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

the images. The equipment owners generally employ the technicians who obtain the images. Hospitals usually contract with radiologists to supervise the technicians.

The record does not show what proportion of images radiologists or nonradiologists interpret in this case. Hospitals may have a variety of arrangements and rules that determine who may order and who is responsible for interpreting medical images of hospital patients. Often, the ordering physicians will interpret the images, but hospital rules usually require a radiologist's interpretation as well. Hospitals generally have contracts with radiologists to insure prompt and reliable image interpretations when physicians order medical images. The contract might provide only that a radiologist be available, but might also provide a specific radiologist or group of radiologists an exclusive obligation and right to interpret all medical images obtained in the hospital.

MSW & B attempted to contract with at least two Tucson hospitals to provide radiology services. In 1978, they unsuccessfully solicited a contract with El Dorado Hospital. In 1983, they bid for a contract at Northwest Hospital, which rejected the bid. HCA owned both hospitals, but managed them through different subsidiaries. Both hospitals ultimately awarded contracts to RL. RL's contracts at Northwest and El Dorado were exclusive, precluding other radiologists from interpreting medical images obtained in those hospitals. Although Northwest rejected their bid, MSW & B maintained an office across the street from Northwest and their business there continued to grow after Northwest opened.

RL had nonexclusive contracts with three other Tucson hospitals, Tucson Medical Center, St. Joseph's Hospital, and St. Mary's Hospital. The radiologists at the University of Arizona exclusively staffed three Tucson hospitals, the University Hospital, Kino Hospital, and the Veterans Administration Hospital. Osteopathic radiologists staffed Tucson General Hospital. At the three hospitals where it had nonexclusive contracts, RL had primary staffing

responsibilities, but other radiologists also had staff privileges. RL appears to have had the obligation and first opportunity to provide night and weekend radiological services, to schedule radiology facilities' use, and to interpret images when the ordering physician did not specify a particular radiologist.

MSW & B asserts a relevant market comprised of referrals by Tucson private (i.e., not associated with the University of Arizona) medical doctors (i.e., those who hold M.D. rather than D.O. degrees) to private medical radiologists. They contend that RL has somewhere between 60% and 70% of that market. They also assert a Northwest Tucson submarket, of which they say Northwest Hospital attracts twenty-seven percent of the patients. MSW & B maintain that RL's and HCA's exclusive service contracts, group boycott, and collective refusal to deal restrained trade and thereby violated section 1 of the Sherman Act. They also contend RL and HCA violated section 2 by monopolizing, attempting to monopolize, and conspiring to monopolize the relevant market.

The district court granted summary judgment to defendants in all of MSW & B's claims except their attempted monopolization claim. The district court held that MSW & B had not shown that RL and HCA had market power. It also held that, in regard to their conspiracy to monopolize, group boycott, and concerted refusal to deal claims, MSW & B had not shown "a conscious commitment to a common scheme designed to achieve an unlawful end." MSW & B appeals the district court's grant of summary judgment on their Sherman Act § 1 claims and their monopolization and conspiracy to monopolize claims.

## DISCUSSION

### I. Standard of Review

We review the district court's grant of summary judgment *de novo*. *See Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Under Rule 56 of the Federal

Rules of Civil Procedure, summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty, Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* We review discovery rulings for abuse of discretion. *See Ah Moo v. A.G. Becker Paribas, Inc.,* 857 F.2d 615, 619 (9th Cir.1988); *Mackey v. Pioneer Nat'l Bank,* 867 F.2d 520, 523 (9th Cir.1989) (refusal to permit further discovery).

## II. The Section 1 Claims

Under the rule of reason,[1] "a section 1 claimant must establish three elements: '(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually restrains competition." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1373 (9th Cir. 1989) (quoting *Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1445 (9th Cir. 1988)). MSW & B contends that RL conspired with Northwest Hospital, specifically intending to restrain trade and to give RL a monopoly of the Tucson private medical radiology market, by contracting that RL would alone provide radiological services at Northwest Hospital.

MSW & B summarizes evidence that they contend creates a genuine factual issue as follows. RL tried to coerce another group of radiologists (Southern Arizona Radiologists ("SAR") which is not a party here) not to compete at another hospital (St. Mary's, which is also not a party) by

threatening to compete for a contract with Northwest Hospital. RL offered not to bid on the contract at Northwest if SAR did not compete for the contract at St. Mary's. Despite this, SAR sought the contract at St. Mary's. RL, however, obtained it. Subsequently, RL bid for the contract with Northwest. Its representative met with Northwest officials and owners. A "steering committee," which RL partisans dominated, advised Northwest to contract with RL. Northwest subsequently did so.

To withstand summary judgment, MSW & B must have shown a genuine factual issue as to whether RL and HCA had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Ralph C. Wilson Indus., Inc. v. Chronicle Broadcasting Cos.,* 794 F.2d 1359, 1365 (9th Cir.1986). They must have provided evidence tending to exclude independent action. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).

■ Because SAR and RL reached no agreement, we need not decide whether an agreement between the two would have violated the antitrust laws.[2] But MSW & B argue that Northwest's and RL's exclusive services contract was itself an illegal agreement in restraint of trade. We disagree. MSW & B cite *Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317 (9th Cir.1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976), in support of their argument. But *Helix Milling* does not stand for the proposition that all contracts are illegal restraints. Nor are exclusive service contracts as such illegal. *See Oltz,* 861 F.2d at 1449.

1. MSW & B do not argue per se violations of section 1, although their complaint did contain a claim of "per se tying," under which Northwest would be the tier, its hospital services the tying product, and radiology services the tied product. But tying would be a violation only if Northwest had market power in the tying product. *See Jefferson Parish Hosp. Dist. No. 2 v.*

*Hyde,* 466 U.S. 2, 13–14, 104 S.Ct. 1551, 1558–59, 80 L.Ed.2d 2 (1984). As we note below, it does not.

2. Nor do we decide whether RL's behavior is evidence on the attempt to monopolize claim that the district court did not dismiss.

MSW & B also fail in their section 1 claims for another reason. "Proving injury to competition in a rule of reason case almost uniformly requires a claimant to prove the relevant market and to show the effects upon competition within that market." *Oltz*, 861 F.2d at 1446.[3] Ordinarily, the relevant market is a question of fact for the jury. *See Oltz*, 861 F.2d at 1446. MSW & B contend that the relevant market is "referrals" to Tucson nonuniversity medical radiologists. We disagree. We find insufficient evidence to show either the geographic or the product market.

### A. Relevant Product Market

■ "The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Id.* That is, there must be sufficient supply and demand inelasticity that a monopolist in that market could profit by raising prices. *See, e.g.,* H. Hovenkamp, *Antitrust,* 100 (West 1986). "For antitrust purposes, defining the product market involves identification of the field of competition: the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Thurman Indus.,* 875 F.2d at 1374 (citing *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 726 F.2d 1381, 1392–93 (9th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984)).

As a preliminary matter, we note that the "referral" market that MSW & B identifies is actually a market in radiologist's services. Indeed, nothing in the record suggests that the referrals as such are ever sold. Our discussion therefore assumes that the product at issue here is radiologist's services.[4]

■ MSW & B defines their product market by the producers' institutional associations rather than by the products' characteristics. Thus they exclude University and osteopathic radiologists' services from their product market. We find, however, insufficient evidence for a jury to conclude that University and osteopathic radiologists cannot compete with private medical radiologists. In support of their exclusion, MSW & B asserts that osteopathic physicians do not order interpretations from private medical radiologists, but MSW & B do not present any evidence whether private medical physicians refer to osteopathic radiologists. They assert that University radiologists did not practice in the five private medical hospitals, but MSW & B present no evidence on University radiologists' non-hospital practice or the proportion of the asserted market that is nonhospital. They assert that University radiologists receive referrals only from University physicians, but not whether University physicians also refer to radiologists outside the University.

Even if MSW & B's assertions are accurate, they cannot show the relevant market. One simply cannot conclude from the evidence who competes to supply radiology services to patients. Referral pattern evidence ignores the possibility that even if referral patterns are quite fixed, or exclusive among osteopathic physicians, or University physicians, there may still be competition for the patients, who are the product's ultimate consumers.

■ Similarly, we must also reject MSW & B's exclusion from the product market of

---

**3.** "[T]he failure to pinpoint precisely the relevant market through detailed market analysis is not uniformly fatal to a claim under Sherman Act § 1." *Oltz,* 861 F.2d at 1448. "'[A]ctual detrimental effects such as a reduction of output, can obviate the need ... [for] elaborate market analysis.'" *Id.* (*quoting FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986)). We find no evidence of such actual detrimental effects.

**4.** None of the parties seems much concerned with what exactly the product is, or who the purchasers are. Although the patients are the

purchasers, MSW & B, by defining the market as referrals, focuses on the patient's physician, who recommends obtaining the images and interpretations. We view the patients, who purchase radiology services on the advice of their physicians, as the consumers. The relationships may be somewhat confused here because the caring physician's recommendation may effectively tie his care to the radiologist's. We note that because no individual physician has market power, the tying is not a per se offense. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. at 13–14, 104 S.Ct. at 1558–59.

image interpretations that nonradiologist physicians provide. We find it implausible that there would be no cross-elasticity between physicians' performing radiology services for their patients and those same physicians' referring those services to radiologists. Indeed, MSW & B do not dispute that physicians who are not radiologists perform substantial radiological services.[5]

■ Inelastic supply in MSW & B's alleged market can exist only if there are barriers to entry. Although MSW & B cites some evidence in support of contract barriers to practicing hospital radiology, the market they identify includes practice outside the hospital as well. The only evidence of entry barriers to this (unquantified) portion of the market that MSW & B assert is the cost of equipping an office. Because the evidence does not permit comparing that cost to potential competitors' resources or expected returns, a jury could not reasonably have found that barrier significant. Moreover, there is no evidence that the radiology contracts at the three largest Tucson hospitals, which were not exclusive, significantly inhibited the hospital radiology competition.[6]

B. *Geographic Market*

■ A geographic market is an " ' "area of effective competition" ... where buyers can turn for alternate sources of supply.' " *Oltz,* 861 F.2d at 1446 (quoting *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1218 (9th Cir.1977)). MSW & B note that *Oltz* distinguished the national market for anesthesiologists from the local market for anesthesia services, and found that there was a local market for anesthesia services. In *Oltz,* however,

the markets for anesthesiologists and for anesthetists were separate, in part because the local hospital provided the only facilities where anesthesia could be performed and exercised total control over who provided anesthesia. There is no evidence for such a barrier here.

Drs. Strand and Taylor conclusorily state that the relevant geographic market is Tucson. We give little weight to such a conclusory assertion. We find no evidence that those two principals were experts qualified to opine on a highly technical economic question. Equally important, we find no record evidence that could support their conclusion. MSW & B cite only two evidentiary items to support their geographic market definition.

They first note that RL appears to have no office or hospital practice outside of Tucson, and that "almost all" referrals to (private medical Tucson) radiologists are of Tucson patients by Tucson (private medical) physicians. But a company may compete in many markets or in only part of a market. Where it competes does not define the market. Indeed, MSW & B's doctors and other radiologists who competed in Tucson had practices outside Arizona. MSW & B presented no evidence to create an issue whether Tucson radiologists are insulated from competition with a wider market of potential competitors.

Finally, MSW & B assert a Northwest Tucson submarket. A submarket exists if it is sufficiently insulated from the larger market so that supply and demand are inelastic with the larger market. *See Thurman Indus.,* 875 F.2d at 1375–77. We find no evidentiary support for a Northwest Tucson market.[7]

5. No doubt there are certain specialized imaging studies that primary care physicians cannot do or prefer to leave to radiologists. In that more limited sphere, primary care physicians and radiologists would not compete. Thus, it seems quite plausible that there might be some market for specific specialized radiological procedures. MSW & B, however, do not assert and do not cite evidence for such a limited market.

6. Some of the hospital contracts may have aided RL's competitors. For example, Dr. Taylor's affidavit relates that he wanted RL to see his

patients from a Health Maintenance Organization [HMO] when he was unavailable. Dr. Taylor says that RL refused to help him unless he stopped soliciting referrals from patients not associated with the HMO. But Dr. Taylor was apparently able, at least for a time, to contract for the HMO's business without being subject to unwanted calls.

7. MSW & B's calculation of Northwest's market share suggests that the submarket's product is hospital services. We doubt that a submarket

### III. The Section 2 Claims

#### A. *Monopolization*

■ A monopolization claim under section 2 of the Sherman Act "is composed of two elements: (1) the defendant's possession of monopoly power in the relevant market and (2) the defendant's willful acquisition or maintenance of such power." *Thurman Indus.*, 875 F.2d at 1373 (citing *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 363 (9th Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988)). "[D]efining the relevant market is indispensable to a monopolization claim." *Id.; see Greyhound Computer Corp. v. International Business Mach. Corp.*, 559 F.2d 488, 493–96 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).

Like the section 1 claims, the monopolization claim fails because of MSW & B's failure to establish a relevant market. But even were we to accept MSW & B's relevant market as they define it, there would be insufficient evidence to show RL's and HCA's market power. Considering the evidence in the light most favorable to MSW & B, a reasonable jury could find the following. First, an RL doctor wrote a memorandum that referred to RL as a monopoly. Second, contracts with five private medical hospitals directed unassigned work to RL. Third, a Tucson radiologist estimated RL's market share as 75% and MSW & B's counsel's paralegal calculated 60–70%. But the evidence shows RL radiologists' gross incomes only, whereas it shows net income for most other radiologists. Market share thus cannot be calculated from the evidence MSW & B provided.

#### B. *Attempted Monopolization*

The district court did not grant summary judgment on MSW & B's attempt to monopolize claim.[8]

#### C. *Conspiracy to Monopolize*

■ In a conspiracy to monopolize claim, as in an attempt to monopolize claim, the elements focus on a "specific intent to monopolize and anticompetitive acts designed to effect that intent, although in the conspiracy claim the act may be no more than the agreement itself.... [N]o particular level of market power or 'dangerous probability of success' has to be alleged or proved in a conspiracy [to monopolize] claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken." *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981) (citation omitted). We have already concluded that there was insufficient evidence of a conspiracy or agreement under the section 1 claim. We likewise affirm the district court's grant of summary judgment on the conspiracy to monopolize claim.

### IV. The District Court's Procedural Rulings

MSW & B contend that the district court should have reconsidered, on the basis of the expert's market evidence, its grant of partial summary judgment on the Northwest Tucson submarket claim. They contend that the district court erred in not compelling RL to produce depositions they obtained from SAR in a different action. They contend that the district court abused its discretion in refusing to compel discovery to help MSW & B meet a discovery deadline. In effect, however, the district court merely refused to extend discovery again. We have examined the record carefully on each procedural ruling and find no abuse of discretion.

---

can have a different product than the parent market.

**8.** "To establish a section 2 violation for an attempt to monopolize, a plaintiff must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anti-competitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir.1988) (citation omitted); *see Thurman Indus.*, 875 F.2d at 1373. *But see Forro Precision, Inc. v. Int'l Business Mach. Corp.*, 673 F.2d 1045, 1059 (9th Cir.1982) (dangerous probability of success not required if conduct "of a kind clearly threatening to competition or clearly exclusionary").

Finally, MSW & B contend that the district court erred in striking their paralegal's affidavit on his market share calculations. Because the calculations showed nothing that could not be deduced from the evidence, any error would have been harmless.

## CONCLUSION

The district court's grant of summary judgment is

AFFIRMED.

James M. LOVE; Dave Frohnmayer, Atty Gen'l, for the State of Oregon, on behalf of the people of the State of Oregon, Tualatin Valley Fruit Marketing, Inc., Plaintiffs,

and

Northwest Food Processors Assoc., Plaintiff–Appellee,

v.

William K. REILLY, Administrator, Environmental Protection Agency, Defendant–Appellant.

No. 89–35230.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1990.

Decided Feb. 1, 1991.

Lisa S. Farringer, Atty., U.S. Dept. of Justice, Washington, D.C., for defendant-appellant.

Susan K. Eggum, McEwen, Gisvold, Rankin & Stewart, Portland, Or., for plaintiffs-appellees.

Before WALLACE, FERGUSON and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

Northwest Food Processors Association (NWFPA) was one of three plaintiffs who filed for an injunction against the Environmental Protection Agency (EPA) to stop the EPA from banning dinoseb, a pesticide. Plaintiffs were granted the injunction, which was upheld on appeal. The NWFPA then filed a petition for attorney's fees in the district court under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. None of the other plaintiffs requested fees. The district court found the NWFPA entitled to fees under the EAJA. The government appeals.

## STANDARD OF REVIEW

The district court's award of attorney's fees under the EAJA is reviewed for abuse of discretion. *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 496 (9th Cir.1987). Where a district court's award of fees under the EAJA involves the interpretation of the statute, the district court's interpretation of the EAJA is a question of law reviewed de novo. *Id.*

## FACTS AND PROCEEDINGS BELOW

In the underlying action in this case, the three plaintiffs (James Love, Tualatin Valley Fruit Marketing (TVFM) and NWFPA) sought and obtained a preliminary injunction under the Federal Insecticide, Fungicide and Rodenticide Act partially staying an EPA order to suspend the use of the pesticide dinoseb. *Love v. Thomas,* 668 F.Supp. 1443 (D.Or.1987). The government appealed the injunction. At this point, several other parties intervened, seeking to stay the injunction pending the appeal. The government did not join in the motion for the stay. The stay was denied. The injunction was ultimately upheld by this court on appeal except for some protective measures imposed by the district court that were not authorized by the statute. *Love v. Thomas,* 858 F.2d 1347 (9th Cir.1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989).

NWFPA then requested attorney's fees under the Equal Access to Justice Act, 28

U.S.C. § 2412, for all fees incurred through the conclusion of the previous appeal. James Love and TVFM did not request fees. The same counsel represented all three plaintiffs but no evidence regarding the fee arrangements between plaintiffs and their counsel was offered.

The district court granted NWFPA attorney's fees for the entire action, up to and including those incurred during the last appeal. The court increased the fees for a cost of living adjustment and also awarded an amount over the statutory ceiling based on the specialized environmental litigation experience of plaintiffs' counsel. The government appeals.

*DISCUSSION*

1. Eligibility for Fees.

The EAJA provides that a court shall award attorney's fees to an eligible prevailing party in a civil suit brought against the United States unless the government's position is substantially justified or special circumstances make an award unjust. 28 U.S.C. § 2412(d)(1)(A). To be eligible, a party must be an "owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed...." 28 U.S.C. § 2412(d)(2)(B)(ii).

The party seeking fees has the burden of establishing its eligibility. *Thomas v. Peterson*, 841 F.2d 332, 337 (9th Cir.1988). In order to prove its eligibility as an association, NWFPA must show that its net worth was less than $7,000,000 at the time this suit began and that it had less than 500 employees. 28 U.S.C. § 2412(d)(2)(B)(ii). At the time this action was filed, NWFPA had a net worth of $265,000 and seven employees. This qualifies NWFPA as an eligible party under the EAJA.

The government seeks to impose an additional burden on associations who apply for fees under the EAJA by requiring the association to prove that each of its members is individually eligible for fees. However, neither the EAJA nor the cases cited by the government place such a burden on all associations.

In *Unification Church v. Immigration & Naturalization Service*, 762 F.2d 1077 (D.C.Cir.1985), the D.C. Circuit held that before an eligible party can recover fees, the court must determine who the real party in interest in the fee litigation is and decide whether that party is eligible for fees. If the real party in interest is ineligible for fees, then the party who filed for fees will not receive them. The appellate court found the Church, not the applying employees, to be the real party in interest because the Church had agreed to pay for the employees' attorney's fees. *Id.* at 1082. The court then denied the employees' fee request because the Church did not meet the eligibility requirements of the Act. *Id.* at 1091–92.

The real party in interest doctrine does not support the government's argument in this case. In *Unification Church*, the court found the Church to be the real party in interest in the fee litigation because it bore the financial responsibility of paying the employees' fees. The government mistakenly assumes that because the members of the NWFPA received benefits from the merits determination in this litigation, the members of the NWFPA are also the real parties in interest for the fee award. This is not so. The members of the NWFPA would be the real party in interest in the fee litigation only if they were liable for the NWFPA's attorney's fees. Nothing in the record points to such an agreement. Therefore, the NWFPA has met its burden of proof by establishing that the association satisfies the eligibility requirements set out in 28 U.S.C. § 2412(d)(2)(B).[1]

---

**1.** The government also cites *United States v. Lakeshore Terminal and Pipeline Co.*, 639 F.Supp. 958 (E.D.Mich.1986), as support for its real party in interest argument. That case is inapposite. There the court pierced the corporate veil and held that the parent of the subsidi-

ary plaintiff was the real party in interest because the operations of the two companies overlapped substantially. *Id.* at 962. In this case, there have been no allegations that the administration and operation of the members' business-

---

es overlaps with the operation of the NWFPA itself.