804 F.Supp. 1165 (1992)
Gerhard FLEGEL, and Richard Still, Plaintiffs,
v.
CHRISTIAN HOSPITAL NORTHEAST-NORTHWEST, Michael R. Richmond, Robert P. Margolis, Richard A. Blath, Donald A. Blum, Wilfrido C. Feliciano, Richard J. Kloecker, Stephen N. Bell, Clarence M. Benage, Leon Bialecki, Alan C. Craig, Elliott H. Farberman, Godofredo M. Herzog, James Debnam, Barbara Ellzey, Joshua Jensen, Loretta May Roberts, Arturo C. Montes, David M. Near, Edward A. Puro, Sanford E. Rabushka, John L. Rollo, William P. Svancarek, Alan F. Tess, Thomas J. Banton, Jr., Mariano N. Floro, Jr., Robert H. Halley, William F. Hoffman, Gerald W. Moritz, Gerald Newport, Sharad P. Parikh, Ebello T. Pasia, Thomas E. Shine, George T. Shuert, Mardonio J.R. Yap, Yoram Hahn, Carl S. Ingber, David Landau, Michael Matar, Thomas E. Ryan, Ivan W. Sletten, Mark L. Travis, Gloria Wattler, William E. Dreyer, Paul J. McKee, Ned Taddeucci, Arthur J. Seewoester, Leo I. Mirowitz, Arnold J. Millner, David M. Margolis, Mary J. Lee, Leonard R. Kostecki, Paul Kohnen, Gerry Kamenko, Paul F. Detrick, Fred L. Brown, Peter W. Callow, Defendants.
No. 90-1290-C (5).
United States District Court, E.D. Missouri, E.D.
October 26, 1992.
*1166 *1167 Steven M. Hamburg, Theresa Counts Burke, Summers, Compton, Wells & Hamburg, P.C., St. Louis, Mo., for plaintiffs.
Richard B. Scherer, Glenn E. Davis, Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, Mo., for defendants.

MEMORANDUM
LIMBAUGH, District Judge.
This matter is before the Court on defendants' motion for summary judgment and plaintiffs' opposition thereto. Plaintiffs are osteopathic physicians who applied for staff privileges at Christian Hospital Northeast-Northwest (hereinafter "CHNE-NW"). Both plaintiffs were subsequently denied staff privileges at CHNE-NW.
Fifty-six individuals are named as defendants in addition to defendant Hospital. The individual defendants at the time in question were employees of the Hospital, members of its Board of Directors or staff physicians.
In the underlying cause of action, plaintiffs allege that defendants:
(1) combined and conspired with one another to illegally boycott the plaintiffs from obtaining hospital staff privileges in violation of Sec. 1 of the Sherman Act, 15 U.S.C. § 1;
(2) entered into a combination and conspiracy in unreasonable restraint of trade and commerce in violation of Sec. 1 of the Sherman Act, 15 U.S.C. § 1;
(3) entered into a contract, combination, or conspiracy to unlawfully prevent plaintiffs from obtaining active staff privileges at CHNE-NW in violation of Sec. 2 of the Sherman Act, 15 U.S.C. § 2;
(4) engaged in unfair competition in violation of state law;
(5) engaged in activity constituting prima facie tortious activity in violation of state law; and
(6) engaged in such activities with malice.

I. Standard for Summary Judgment
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. *1168 1976). With these principles in mind, the Court turns to an examination of the facts.

II. Facts
CHNE-NW is a private, not-for-profit hospital which operates from two locations in North St. Louis County, Missouri. There are 565 physicians on staff at CHNE-NW, including 50 doctors of osteopathy.

A. Training of Dr. Gerhard Flegel
Upon graduation from the University of Missouri in 1963, Dr. Flegel commenced medical school at the Kirksville Osteopathic College of Medicine, where he completed a four-year program and obtained a Doctor of Osteopathy (D.O.) degree. He followed this with a one-year rotating internship at Normandy Osteopathic Hospital with a focus on urologic service. For the next two years, Dr. Flegel enlisted in the United States Army where he completed one year with the 82nd Airborne Division at Fort Bragg and transferred into the Green Berets in Vietnam, where he headed a hospital unit and attained the rank of captain. During his two years with the military, Dr. Flegel was an Assistant Company Surgeon and took care of all the Special Forces personnel within the 7th Special Forces. In addition, he supervised the operation of a military hospital for the III and IV Corps.
Dr. Flegel commenced his surgical residency at the Normandy Osteopathic Hospital in 1970 and successfully completed a four-year training program. Thereafter, he commenced a two-year urological surgery residency program at the Cherry Hill Medical Center in New Jersey and rotated through the University of Pennsylvania Medical School. Completion of this program occurred in 1976, subsequent to which Dr. Flegel obtained certification by the AOA (American Osteopathic Association) Board in the subspecialty of urologic surgery.
Dr. Flegel has himself been a trainer of osteopathic physicians who participated in internships as well as surgical residency programs at the Normandy Osteopathic Hospitals. Further, Dr. Flegel served as Chairman of the Department of Surgery at Normandy Osteopathic Hospital, now Deaconess, for several years during the 1980's. In addition to having lectured extensively in urology, Dr. Flegel has published at least six papers in Board of the American Osteopathic Board of Surgery. As such, Dr. Flegel is responsible for examining and certifying graduates of the osteopathic urological residency programs throughout the country in their subspecialty.

B. Training of Dr. Richard Still
Dr. Still completed four years of undergraduate work at Northeastern Missouri State in 1974. Thereafter, he commenced and completed four years of medical school training at the Kirksville College of Osteopathic Medicine where he obtained a D.O. degree. Following this, he completed a twelve-month rotating internship at Normandy Osteopathic Hospital, followed by a four-year general surgery residency at the Normandy Osteopathic Hospital, which concluded in 1983.
Dr. Still then did a two-year urological specialty residency at the University of Medicine and Dentistry of New Jersey from 1983 to 1985. During the residency, Dr. Still rotated through the University of Pennsylvania Medical School program and served as Chief Resident in his final year of urologic residency. Dr. Still obtained his certification from the AOA in February of 1988. Dr. Still has engaged in the training of interns and residents for the last seven years in the Normandy Osteopathic Hospital program, and has conducted lectures for various osteopathic organizations. Additionally, Dr. Still has received two awards for his professional activities as a surgeon.

C. CHNE-NW's Credentialing Process
In 1979, the Department of Surgery of CHNE-NW, in order to evaluate candidates for staff membership, established guidelines for eligibility. The guidelines indicated a surgical specialist was one certified by the American Board of Medical Specialties ("ABMS"), or was eligible for certification by such a board. In order to *1169 be certified by the ABMS as recommended by the Department of Surgery Guidelines in effect at that time, three years of post-graduate training in the field of urologic surgery at a training program accredited by ACGME were required. The AOA has also required three years of post-graduate training in urology since July 1, 1986, a date after which both Dr. Flegel and Dr. Still were certified. The hospital By-laws at the time indicated that an applicant for medical staff appointment seeking surgical privileges was to have completed the number of years of residency in general surgery or a surgical specialty as approved by ACGME or the Committee on Post Doctoral Training of the American Osteopathic Association, sufficient to satisfy the specialty board requirements for eligibility to become certified, in effect at the date application for medical staff appointment is submitted.
In February to March of 1989, the surgical guidelines were revised to become "Requirements for Applicants to the Department of Surgery." The new requirements required an applicant to be ABMS certified or eligible, which requires attendance at an ACGME accredited post-graduate training institution. In September of 1989, the Bylaws Committee met and deleted references to the AOA Board certification. This revision found its way into the 1990 By-laws. Osteopathic surgeons on staff were grandfathered so as to not make them ineligible for continued membership.
Defendants allege that the change in the Department of Surgery requirements was initiated to maintain and increase the quality of care within the department, to upgrade the reputation of the hospital, to respond to community concerns about the quality of the specialists on the staff, and to satisfy recommendations made by hospital accrediting organizations such as the Joint Commission for Accreditation of Hospital Organizations ("JCAHO"). Plaintiffs allege that the changes were instituted after a letter was written by Defendant Richard Blath, an M.D. urologist, to the Vice President in charge of Medical Affairs at CHNE-NW, in which he outlined his concerns regarding eligibility for admission to the Department of Surgery. Plaintiffs further allege that this led to the formation of the Ad Hoc Committee of the Department of Surgery regarding criteria for surgery applicants, which convened on January 20, 1989 wherein defendant Blath's letter was reviewed along with the memorandum of the Vice President of Medical Affairs, which discussed among other things how he believed the hospital would formulate criteria for admission to the staff without violating antitrust law.
Currently, as well as during the period of time that both Drs. Flegel and Still were being trained, training slots in ACGME (Accreditation Council for Graduate Medical Education) accredited training programs for surgical subspecialties were not available to graduates of osteopathic medical schools. When Dr. Flegel and Dr. Still applied to CHNE-NW, both had been certified urologic specialists by the AOA Board, the osteopathic counterpart to an ABMS Board, based upon their two-year urological specialty residency.

D. Dr. Flegel's Application Process
Dr. Flegel filed his application for staff privileges at CHNE-NW on August 15, 1988. By November 16, 1988, Dr. Flegel's application was considered complete and evaluated. Dr. Flegel's application went through four levels of review: the Surgical Review Committee ("SRC"), the Credentials Evaluation Committee ("CEC"), the Medical Executive Committee ("MEC"), and the Board of Directors. On December 5, 1988 the SRC met to consider Dr. Flegel's application. Dr. Flegel had applied to CHNE-NW for privileges as a specialist in urological surgery. The SRC recommended the denial of Dr. Flegel's request for privileges because he had not received training at an institution accredited by the ACGME. Twelve physicians from the Department of Surgery were present at the SRC meeting concerning Dr. Flegel. Only one of them, Dr. Richard Blath, practices urologic surgery at CHNE-NW.
On December 6, 1988, the CEC met to review Dr. Flegel's application and evaluated Dr. Flegel pursuant to the point system *1170 set out in the By-laws. Based upon Dr. Flegel's overall score, the CEC recommended denial of the privileges requested. Fifteen doctors participated in the CEC meeting concerning Dr. Flegel's application. None of these physicians were urologic surgeons.
One week later, on December 13, 1988, the MEC met and recommended denial of all requested privileges. Seventeen physicians were present at this meeting; only one was a urologist. On January 27, 1989, the Board of Directors, upon recommendation of the MEC, acted to deny all privileges requested, and advised Dr. Flegel of his appeal rights. Dr. Flegel requested and obtained a hearing before an Ad Hoc Committee, which was appointed by the hospital's Chief of Staff. None of the members of the Ad Hoc Committee had participated in the decision of the SRC, CEC or the MEC. The Ad Hoc Committee's report, which recommended that the MEC rescind its preliminary determination was presented to the MEC on April 11, 1989. After further deliberation, the MEC sustained its prior position.
Thereafter, Dr. Flegel requested appellate review by the Board of Directors; and, on May 18, 1989, the decision was made to follow the recommendation of the MEC, and Dr. Flegel's request for staff privileges was formally denied on May 26, 1989. Each of the committees, except the SRC, considering Dr. Flegel's request, included osteopathic physicians. All, except the SRC and the MEC, did not include any urologists.

E. Dr. Still's Application Process
Dr. Still's application was filed on September 9, 1988. By April, 1989, Dr. Still's application was complete and ready for processing. On April 3, 1989, the SRC met and recommended denial of privileges due to "inadequate specialty and subspecialty training." The membership of this SRC was not identical to the SRC that considered Dr. Flegel's application the prior year. Fourteen physicians participated in this meeting, two of which were urologists. On April 4, 1989, the CEC met and recommended denial of the requested privileges for various reasons, including Dr. Still's numerical rating. The CEC meeting concerning Dr. Still was attended by fourteen physicians, none of whom were urologists.
On April 11, 1989, the MEC made a recommendation of denial of staff privileges, primarily based on Dr. Still's failure to obtain the necessary point rating. This committee consisted of sixteen physicians, including only one urologist. Dr. Still was informed of his appellate rights and requested a hearing. The Chief of Staff appointed an Ad Hoc Committee which included an osteopathic physician, but did not include any urologists on staff. The Ad Hoc Committee held a hearing on May 23, 1989 and affirmed the MEC's decision to deny Dr. Still's application. On June 13, 1989, the MEC sustained its previous recommendations because Dr. Still failed to obtain the necessary numerical rating required for a specialist in urology.

F. Relevant Information for Market Determination
There are approximately 65 urologists practicing in the St. Louis metropolitan area. Most urologists practice at multiple hospitals, including those on the staff at CHNE-NW. CHNE-NW has 11 urologists on its medical staff. The urologists are members of three independent urology groups. Defendants allege that none of the individual defendants have any business affiliation with Defendant Blath.
CHNE-NW is one of twenty-nine hospitals in the St. Louis metropolitan area, excluding eleven local hospitals in Illinois. Defendants allege that CHNE-NW maintains 14% of the total number of beds and medical-surgical beds in St. Louis County. Defendants further allege that CHNE-NW maintains but 8% of such beds in the metropolitan St. Louis area as a whole. With respect to discharges, defendants allege that CHNE-NW had 14% of the total discharges and 15% of the medical-surgical discharges in St. Louis County, and less than 6.5% of both categories of discharges in the St. Louis metropolitan area in 1989. Defendants also allege that CHNE-NW *1171 historically accounts for 5% of the outpatient surgeries in the metropolitan St. Louis area. Defendants admit that CHNE-NW has affiliations with various third-party payors such as HMOs, PPOs, and private insurance companies that reimburse the hospital and physicians for services provided to patients. Defendants allege, however, that CHNE-NW exercises no control over access of physicians to such plans and numerous other hospitals are members of each of the plans.
Defendants allege that CHNE-NW is not the only hospital serving and providing a complete range of hospital services to North St. Louis County residents. Defendants further allege that plaintiffs have available to them, at multiple hospital locations, all necessary facilities to treat North County patients, including facilities in North St. Louis County, and, therefore, access to CHNE-NW's facilities is not essential or vital to any physician seeking to treat North St. Louis County residents.
Plaintiffs allege that CHNE-NW's dominance in North St. Louis County is undisputed. Plaintiffs allege that CHNE-NW maintains its dominance through 911 ambulance service, physician referral networks through the hospital and an independent physician group known as CHPG. Plaintiffs also allege that the Participating Physician Agreement between the CHPG and its individual members insures that referrals coming from member physicians will go only to urologic surgeons who are on staff at CHNE-NW and the patient will be admitted at CHNE-NW. Plaintiffs further allege that many D.O.s engaged in family and general practice, as well as internal medicine who previously maintained their practices at Normandy Osteopathic Hospital (Deaconess) have now sought and obtained privileges at CHNE-NW. Plaintiffs allege that the switch in affiliation by D.O.s in these specialties comes as a result of Normandy's location and patients' requests that their physician become affiliated with CHNE-NW for insurance or geographic reasons. Plaintiffs also allege that the referral base of plaintiffs are these D.O.s who refer plaintiffs their patients who are in need of urologic treatment.
Both Dr. Flegel and Dr. Still, at the time they were being considered for staff privileges, already were on staff at several other area hospitals. Dr. Flegel enjoyed staff privileges at Deaconess Hospital North and West (formerly Metropolitan Medical Center and Normandy Osteopathic), at Wentzville Community Hospital and at Barnes/St. Peters. Dr. Still enjoyed staff privileges at each of these hospitals and at the Hermann Area Hospital. Deaconess North is approximately 10 miles from CHNE.
Additionally, on October 24, 1990, the Board of Trustees of DePaul Hospital ("DePaul") approved staff privileges for both Drs. Flegel and Still. Defendants allege that DePaul is a direct competitor of CHNE-NW and is also located in North St. Louis County, Missouri. DePaul is located approximately six miles from CHNE-NW. According to DePaul's administration, DePaul's medical staff is open to applications from D.O. general practitioners. A number of practitioners, including D.O.s have staff privileges at both DePaul and CHNE-NW.
Both Dr. Flegel and Dr. Still have testified that they draw their patient base from throughout the St. Louis metropolitan area. Dr. Flegel testified that he draws patients from Belleville, Illinois and Alton, Illinois, and that these patients commute to DePaul or Deaconess North for treatment. Plaintiffs discovery responses reveal that they are fully employed in the practice, have experienced increases in the number of patients they treat, and they have raised the price for their services since their denial at CHNE-NW. Plaintiffs are aligned with various insurance plans, including HMOs and PPOs.

III. Boycott Per Se Antitrust Claim
In Counts I and VII of their Complaint, plaintiffs argue that the denial of staff privileges to them amounted to an illegal group boycott and a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In their motion for summary judgment, defendants argue that the per se rule is inapplicable to the present action. Plaintiffs, *1172 however, argue that the per se rule is applicable to plaintiffs antitrust claims in that CHNE-NW's admissions policies discriminate against and effectively exclude all D.O.s from CHNE-NW's Department of Surgery.
In Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co., 472 U.S. 284, 295, 105 S.Ct. 2613, 2620, 86 L.Ed.2d 202 (1985), the United States Supreme Court held that a "plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." Id. "The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominately anticompetitive." Id. Additionally, in Federal Trade Commission v. Indiana Federation of Dentists, 476 U.S. 447, 458-59, 106 S.Ct. 2009, 2017-18, 90 L.Ed.2d 445 (1986), the United States Supreme Court expressly rejected extending the per se rule to cases in which the defendants lack market power or the economic impact of the challenged activity is not immediately obvious. Id.
Plaintiffs cite Weiss v. York Hospital, 745 F.2d 786, 818 (3d Cir.1984), which was decided prior to Northwest Wholesale or Indiana Federation, to support their argument that a per se rule is applicable in the present case. In that case, evidence was presented that the defendant hospital historically admitted any M.D. who applied for staff privileges, upon cursory review, but engaged in strict scrutiny of any D.O. applicant's medical qualifications and also considered the applicant's social acceptability. Id. at 795. With respect to the plaintiff's application, the hospital made extensive inquiries into both his medical ability and moral character. Id. at 797. The Third Circuit Court of Appeals applied the per se standard in Weiss because different standards were being applied to osteopaths and M.D.s. The court then went on to note that it did not doubt that "a hospital could exclude an applicant from staff privileges either because he is not medically qualified or because of unprofessional conduct, so long as the hospital applies the same standards to all applicants." Id. at 820-21, n. 60. The court then went on to note that:
restricting staff privileges to doctors who have achieved a specified level of medical ability falls within the scope of a hospital's "public service" function, and therefore the rule of reason analysis, not the per se rule of illegality, would control. Applying the rule of reason analysis, it seems obvious that by restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of medical care that it delivers.
Id. at 821, n. 60.
In the present case, the same standards are applied to both osteopathic (D.O.) and allopathic (M.D.) physicians. Assuming that the standards were based upon allopathic, rather than osteopathic, standards, they were still applied equally to all applicants. In addition, the osteopathic requirements for surgical subspecialty had been increased prior to plaintiffs' application to match that of the allopathic physicians. Moreover, courts have held that expressly approved credentialing criteria, based upon allopathic training requirements, does not violate constitutional equal protection rights, even if they may tend to exclude osteopaths. See Silverstein, D.O. v. Gwinnett Hosp. Authority, 861 F.2d 1560, 1564-67 (11th Cir.1988) and Berman v. Florida Medical Center, Inc., 600 F.2d 466, 468 (5th Cir.1979). Since Weiss, federal courts addressing a denial or revocation of a physician's hospital staff privileges have applied a rule of reason standard, not a per se standard, in their analysis. See, e.g., Oksanen v. Page Memorial Hospital, 945 F.2d 696 (4th Cir.1991); Goss v. Memorial Hospital System, 789 F.2d 353, 355 (5th Cir.1986); and Brown v. Our Lady of Lourdes Medical Center, 767 F.Supp. 618, 628 (D.N.J.1991).
Thus, the behavior alleged by plaintiffs in the present action does not fall into a category likely to have predominately anticompetitive effects and does not apply markedly different standards to osteopaths and allopaths as the hospital in Weiss did. *1173 In addition, the economic impact of the challenged activity is not immediately obvious and defendants lack market power. In Indiana Federation, the Supreme Court expressly rejected extending the per se rule to these types of cases. Plaintiffs have produced no evidence which would show that the economic impact of denial of staff privileges for plaintiffs at CHNE-NW is immediately obvious. The number of patients which Drs. Flegel and Still treated rose substantially from 1988 to 1990. In addition, CHNE-NW does not possess market power in any properly defined relevant market. This will be discussed further in Section IV.
Thus, it is the opinion of this Court that defendants' motion for summary judgment should be granted as to Counts I and VII of plaintiffs' Complaint because the per se rule is inapplicable as a matter of law to plaintiffs' antitrust claims in that:
(1) the behavior alleged by plaintiffs does not fall into a category likely to have predominately anticompetitive effects;
(2) the economic impact of the challenged activity is not immediately obvious; and
(3) defendants lack the necessary market power.

IV. Unreasonable Restraint of Trade Claim
In Counts II and VIII of their Complaint, plaintiffs allege that defendants entered into a combination and conspiracy in unreasonable restraint of trade and commerce by adopting arbitrary staff admission requirements and evaluating them under a point system in an arbitrary manner. In their motion for summary judgment, defendants argue that plaintiffs have failed to establish that defendants possess the necessary market power or that the challenged actions created or can create any anticompetitive effects. Plaintiffs argue that they have presented sufficient evidence to support the market definitions proposed by plaintiffs, that market definition is a question of fact to be determined by a jury, and, therefore, summary judgment as to Counts II and VIII should be denied because there is a genuine issue of material fact.
To determine whether a practice unreasonably restrains trade, a court must analyze the degree of harm to competition along with any justifications or pro-competitive effects to determine whether the practice is unreasonable on balance. Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1413 (9th Cir.1991). The focus is on the actual effect that the challenged restraint has had on competition in a relevant market. Id. The relevant market is defined in terms of product or service market and geographic market. Baxley-DeLamar Monuments, Inc. v. American Cemetery Association, 938 F.2d 846, 850 (8th Cir.1991). Plaintiffs argue that the relevant market is the "market for referrals of Targeted Patients from osteopathic physicians at CHNE-NW." Targeted Patients are defined as "the patients who potentially would have been referred to plaintiffs by osteopathic physicians." Plaintiffs concede that they also compete with urologists at CHNE-NW in a broader geographic and product market, but argue that the relevant market is a narrow geographic and product market within the broader geographic and product market.
In Thurman Industries, Inc. v. Pay `N Pak Stores, Inc., 875 F.2d 1369, 1377 (9th Cir.1989) and in Belfiore v. New York Times Co., 826 F.2d 177, 180 (2d Cir.1987), the Courts of Appeals rejected plaintiffs' attempts to define a submarket within a broader market, as plaintiffs attempt to do in the present case. In both of these cases, the court found that plaintiffs failed, as a matter of law, to create a genuine issue of material fact as to the relevant market by attempting to create such a submarket.
In Morgan, Strand, Wheeler, & Biggs v. Radiology, Ltd., 924 F.2d 1484 (9th Cir. 1991), the United States Court of Appeals for the Ninth Circuit rejected a market definition similar to plaintiffs'. In Morgan, the plaintiffs sought to define the relevant market as "referrals by Tucson private (i.e., not associated with the University of Arizona) medical doctors (i.e., those who hold M.D. rather than D.O. degrees) to *1174 private medical radiologists." Id. at 1487. The court noted that "the `referral' market that [plaintiff] identifies is actually a market in radiologist's services." Id. at 1489. The court went on to note that nothing in the records suggest that referrals as such are ever sold and, therefore, the court assumed that the product at issue was radiologist's services. Id. The court observed that even if plaintiffs' assertions were correct, they did not show the relevant market. "Referral pattern evidence ignores the possibility that even if referral patterns are quite fixed, are exclusive among osteopathic physicians, ... there still may be competition for the patients, who are the products' ultimate consumers." Id.
In the present case, nothing in the record suggests that osteopathic referrals are ever sold, and, therefore, the relevant service market in the present action is actually the market for urological services. In addition, the affidavits of the osteopathic physicians, from which plaintiffs have allegedly lost referrals at CHNE-NW to, all indicate that they still make referrals to plaintiffs. Plaintiffs, therefore, have narrowed their market definition to only lost referrals from osteopathic physicians at CHNE-NW, not all referrals from osteopathic physicians at CHNE-NW. This service market definition is too narrow and is erroneous as a matter of law. Thus, plaintiffs have failed, as a matter of law, to create a genuine issue of material fact as to plaintiffs' definition of a submarket within the broader market for urological services. There is no reasonable legal or factual basis for such a definition of service market.
Similarly, plaintiffs' definition of a narrow geographic market within a broader geographic market is erroneous as a matter of law. Geographic market is defined by the "geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." Baxley-DeLamar Monuments, Inc., 938 F.2d at 850. The courts have consistently refused to limit the geographic market to a single hospital, where there are other hospitals operating in the surrounding area. See, e.g., Oksanen v. Page Memorial Hospital, 945 F.2d 696, 709-10 (4th Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 480 (7th Cir.1988); and Dos Santos v. Columbus-Cuneo-Cabrini Medical Center, 684 F.2d 1346, 1353 (7th Cir.1982). Plaintiffs themselves practice and have staff privileges at hospitals in a geographic area that even extends beyond the metropolitan St. Louis area. Thus, plaintiffs have failed, as a matter of law, to create a genuine issue of material fact as to a geographic definition of market limited to CHNE-NW. There is no reasonable legal or factual basis for such a geographic market definition. This is particularly true when plaintiffs themselves practice in a geographic market larger than the one proposed for the relevant geographic market and when plaintiffs admit there is a broader geographic market in which they compete.
To show an anticompetitive market effect, a plaintiff must demonstrate that the defendants have significant market power in the relevant market or that the practice complained of enhances defendants' market power or put them in a position in which they could harm competition. Hassan v. Independent Practice Associates, P.C., 698 F.Supp. 679 (E.D.Mich.1988) citing Davis-Watkins Co. v. Service Merchandise, 686 F.2d 1190, 1202 (6th Cir. 1982) and Oreck v. Whirlpool Corp., 579 F.2d 126, n. 5 (2d Cir.1978) (en banc), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).
Plaintiffs have failed to present evidence sufficient to create a genuine issue of material fact that the defendants have significant market power in the correct relevant market, which would be the market for urological services in a geographic area surrounding CHNE-NW. It is unnecessary for this Court to determine the exact dimensions of this geographic market, because plaintiffs have failed to present sufficient evidence that defendants possess market power in any range of realistic markets, not submarkets, in which plaintiffs or CHNE-NW compete. In addition, plaintiffs *1175 have failed to show that their denial of staff privileges at CHNE-NW enhanced defendants' market power or put defendants in a position in which they could harm competition. It is undisputed that plaintiffs' practices have continued to grow, despite their denial at CHNE-NW. Plaintiffs even continue to receive referrals from the osteopathic physicians which they have labeled as their relevant market.
Thus, it is the opinion of this Court that defendants' motion for summary judgment as to Counts II and VIII should be granted because plaintiffs' definition of the relevant market is erroneous as a matter of law and there is no genuine issue of material fact as to defendants' market power or the lack of anticompetitive effects of defendants' actions. Defendants, therefore, are entitled to summary judgment, as a matter of law.

V. Monopolization Claim
In Counts III and IX of their Complaint, plaintiffs allege that defendants have obtained and maintain a substantial share of the market and conspired to prevent plaintiffs from obtaining staff privileges at CHNE-NW. In their motion for summary judgment, defendants argue that plaintiffs have failed to establish that defendants have the necessary monopoly power in the relevant market. Plaintiffs, under their definition of the relevant market, argue that defendants' market share is exclusive and, therefore, monopoly power exists.
To establish a monopolization claim in violation of Section 2 of the Sherman Act, plaintiffs must prove defendants' possession of monopoly power in the relevant market and the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966). To establish possession of monopoly power, plaintiffs must prove that defendants possess the power to control prices or exclude competition within a relevant market. United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); Midwest Radio Co., Inc. v. Forum Publishing Co., 942 F.2d 1294, 1297 (8th Cir.1991).
As discussed in Section V, plaintiffs' definition of the relevant market is erroneous as a matter of law. Thus, the relevant product and geographic markets should be the market for urological services in a geographic area surrounding CHNE-NW. Plaintiffs admit that there is a market broader than the one they are attempting to define in which they compete. Plaintiffs themselves practice in a market even larger than the St. Louis metropolitan area. Again, it is unnecessary for this Court to determine the exact dimensions of this geographic market, because plaintiffs have failed to present sufficient evidence that defendants possess monopoly power in any range of realistic markets in which plaintiffs or CHNE-NW compete. Plaintiffs have not presented evidence sufficient to create a genuine issue of material fact that defendants possess the power to control prices or exclude competition within the relevant market. As stated previously, it is undisputed that plaintiffs' practices have grown substantially and the price for their services has increased, despite their denial at CHNE-NW. Plaintiffs continue to receive referrals from the osteopathic physicians which they have labeled as their relevant market.
Thus, it is the opinion of this Court that defendants' motion for summary judgment as to Counts III and IX should be granted because plaintiffs' definition of the relevant market is erroneous as a matter of law and plaintiffs have created no genuine issue of material fact as to defendants monopoly power within the correct relevant market. Defendants, therefore, are entitled to summary judgment as a matter of law.

VI. State Claims
In Counts IV, V, X and XI, plaintiffs allege state claims of unfair competition and prima facie tort. Based upon 28 U.S.C. § 1367(c)(3), this Court declines to exercise *1176 supplemental jurisdiction as to plaintiff's state claims because defendants shall be granted summary judgment as to all of plaintiffs' claims in which this court has original jurisdiction.

VII. Malice Claim
In Counts VI and XII of their Complaint, plaintiffs have requested punitive damages based upon the other Counts. To the extent that defendants' motion for summary judgment is to be granted as to Counts I, II, III, VII, VIII, and IX, plaintiffs' claims for punitive damages as to those Counts is moot and should be dismissed with prejudice.