**TYR SPORT, INC., Plaintiff(s),**

v.

**WARNACO SWIMWEAR, INC.,
et al., Defendant(s).**

**Case No. SACV 08–529 JVS (MLGx).**

United States District Court,
C.D. California.

March 16, 2010.

Christopher W. Arledge, One LLP, Costa Mesa, CA, Jennifer Sun, Lawrence J. Hilton, William E. Halle, O'Neil LLP, Irvine, CA, for Plaintiff.

Stuart M. Richter, Zia F. Modabber, Gregory S. Korman, Katten Muchin Rosenman, Adam Paul Brezine, Jonathan G. Fetterly, Holme Roberts & Owen LLP, Los Angeles, CA, Jennifer Bielak, Richard R. Young, Holme Roberts & Owen LLP, Colorado Springs, CO, Richard J. Foster, Law Office of Richard J. Foster, Seal Beach, CA, for Defendants.

## FINAL ORDER RE MOTIONS FOR SUMMARY JUDGMENT

JAMES V. SELNA, District Judge.

Defendant Warnaco Swimwear, Inc., dba Speedo USA, ("Speedo") moves for summary judgment under Federal Rule of Civil Procedure 56 on the remaining claims for relief asserted against it by Plaintiff TYR Sport, Inc. ("TYR"). Defendants United States Swimming, Inc. ("USA Swimming") and Mark Schubert ("Schubert") also move for summary judgment under Rule 56 on TYR's remaining claims. Speedo and USA Swimming and Schubert (collectively, "Defendants") join each others' respective motions. TYR opposes both motions.

## I. BACKGROUND

TYR and Speedo both design and manufacture high-end swimwear and accessories sold to competitive swimmers. (Statement of Genuine Issues in Opp'n to USA Swimming ("SGI USA") ¶ 3.) USA Swimming is the national governing body ("NGB") of the sport of swimming in the United States, per the Ted Stevens Amateur Sports Act ("Sports Act"), 36 U.S.C. § 220522. (*Id.* ¶ 1.) In 2006, USA Swimming hired Schubert to be the National and Olympic Team head coach and general manager, though Schubert was and remained a paid spokesperson for Speedo. (*Id.* ¶¶ 2, 9–10.) Speedo also has a sponsorship agreement directly with USA Swimming, and has been the exclusive swimwear equipment sponsor of USA Swimming since 1984. (*Id.* ¶¶ 6, 115.)

TYR alleges that Speedo, USA Swimming, and Schubert formed a combination

to make USA Swimming a de facto sales agent for Speedo. Specifically, TYR contends that Schubert, wielding extraordinary influence in the swimming community as the Olympic and National Team head coach, made false statements in promoting Speedo's products and disparaging TYR's.

Much of the controversy centers on the run-up to the 2008 Olympic Games in Beijing. At the time, high-end swimsuit manufacturers were engaged in something of an arms race. (*See id.* ¶¶ 13–16, 173.) Each was attempting to market suits that could significantly reduce the swimming times of elite swimmers. (*See id.;* Young Decl., Ex. B ¶¶ 6–9.) On February 12, 2008, Speedo released its newest suit, the LZR Racer, an upgrade from its previous suit, the Fast Skin Pro ("FS Pro"). (SGI USA ¶¶ 13; Young Decl., Ex. B ¶¶ 3–6.) TYR, one of Speedo's primary competitors in the American market, was working to develop its own elite racing suit, the Tracer Rise, in time for the run-up to the Beijing Games. (SGI USA ¶¶ 14–15.)

Schubert, a paid spokesman for Speedo and the head coach and general manager of the Olympic and National Swim Teams, touted the advantages of the just-released LZR Racer. Just prior to a swim meet in Manchester, England, Schubert gathered the swimmers on the National Team and encouraged them to wear the LZR Racer, stating that it offered a "2% advantage." (*Id.* ¶ 17.) Schubert was also quoted in a newspaper and magazine article by a reporter covering the meet that, "[i]f you take [the] best times of world record holders and their new times [in the LZR Racer], the difference is 2 per cent." (*Id.* ¶¶ 22–23; Young Decl., Ex. O.) Schubert was also allegedly quoted as saying that he "would strongly advise [the swimmers] to wear the [Speedo] suit at trials, or they

may end up at home watching [the Olympics] on NBC." (Complaint ¶ 16(*l*).) [1]

Erik Vendt ("Vendt"), an American swimmer who signed an endorsement deal with TYR in 2006, got caught up in the arms race. (SGI USA ¶ 215.) In late 2007, as he was training to make the U.S. Olympic Team and potentially win a medal in Beijing, Vendt was dissatisfied with the suit TYR had provided. (*Id.* ¶ 216.) In fall 2007, he made several calls to Schubert, his coach on the National Team and previously at the University of Southern California, to complain about his TYR suit. (*Id.* ¶¶ 214, 216.) Schubert recalls telling Vendt to talk to his agent and TYR about his concerns. (Schubert Depo. 214:6–7, 215:4–6.)

In December 2007, Vendt and his agent met with TYR. (SGI USA ¶ 220.) TYR invited him to test the yet-to-be-released Tracer Rise. (*Id.*) He was apparently very happy with it. (*Id.*) However, two weeks later, he informed TYR that he planned to wear the Speedo FS Pro at a January 2008 meet in Long Beach, California. (*Id.* ¶ 221.) TYR responded by promptly canceling Vendt's endorsement deal. (*Id.*)

By the time of the U.S. Olympic Trials, only one of the TYR-sponsored swimmers present at the Manchester meet, Katie Carroll ("Carroll"), had switched from wearing a TYR suit to Speedo. (Statement of Genuine Issues in Opp'n to Speedo (SGI Speedo) ¶ 34.) Several swimmers wore a TYR suit at the Trials and qualified for the Olympic Team. (*Id.* ¶ 45.) In particular, Matt Grevers won two gold medals, a silver medal, and set a world record in Beijing while wearing the Tracer Rise. (*Id.* ¶ 164.) Meanwhile, the Speedo-wearing swimmers experienced unparalleled success at the Olympics. All told, 86% of

---

1. Neither party has pointed the Court to evidence that Schubert actually made this statement However, as the Defendants do not contest the issue, the Court will accept the allegation in the Complaint as true for summary judgment purposes.

the swimming medals in Beijing, including 91% of the gold medals, were won by swimmers wearing the LZR Racer. (*Id.* ¶ 55.)

The arms race continued after the Olympics, with other competitors—including Arena, Jaked, and Blue 70—gaining ground on, and sometimes overtaking, the performance of the suits designed by Speedo and TYR. (*Id.* ¶ 64.) However, Schubert continued his promotion of the Speedo brand, at one point advising two swimmers on the Junior National Team to wear the LZR Racer because it was "faster" than the TYR and Blue 70 suits they were wearing at the time. (*Id.* ¶ 155.)

However, everything came to an end in July 2009, when FINA, the sport's international governing body, decided to ban from competitions the high-performance full-body suits, including the LZR Racer and the Tracer Rise, starting on January 1, 2010. (*Id.* ¶ 67.) USA Swimming, meanwhile, decided to move the deadline for banning the full-body suits in its own competitions up to October 1, 2009. (*Id.*) This effectively ended the market for the high-performance swimsuits.

At this stage in the litigation, TYR has seven remaining claims against Speedo, USA Swimming, and Schubert.[2] TYR's First and Third claims, asserted against all three Defendants, allege a violation of the Sherman Act § 1, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof.Code § 16720 *et seq.* The Second claim, against Speedo alone, alleges a violation of Section 2 of the Sherman Act. The Fourth claim, against Speedo, alleges false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a). The Sixth, Ninth, and Tenth claims, against all three Defendants, allege tortious interference with contractual relations, violation of the California Unfair

Competition Law, Cal. Bus. & Prof.Code § 17200 *et seq.*, and seek injunctive relief.

## II. *LEGAL STANDARD*

Summary judgment is appropriate only where the record, read in the light most favorable to the nonmoving party, indicates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *See id.* at 322–23, 106 S.Ct. 2548. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.,* 210 F.3d 1099, 1103 (9th Cir.2000).

Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical

---

**2.** The claims are numbered here as they are in the body of the Complaint, rather than on the cover page.

doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citations omitted). In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Am. Int'l Group, Inc. v. Am. Int'l Bank*, 926 F.2d 829, 837 (9th Cir.1991).

## III. DISCUSSION

The Court considers two summary judgment motions, one brought by Speedo, the other by USA Swimming and Schubert. Because of significant overlap between the motions, the Court treats them here together. The Court considers the challenged claims in turn.

### A. Federal and State Antitrust Claims (First through Third Claims)

TYR alleges a conspiracy among Speedo, USA Swimming, and Schubert to restrain trade such that USA Swimming acted as a de facto sales agent for Speedo, promoting Speedo's products to the detriment of Speedo's competitors.

#### 1. Coercion

In the Court's prior order on the Defendants' motions to dismiss (Docket No. 72), the Court clarified exactly what TYR would have to prove to demonstrate an unlawful conspiracy in violation of the Sherman Act and the Cartwright Act. (*See id.* at 6–9.) The Defendants had argued that TYR could not maintain a Sherman Act § 1 conspiracy claim where the alleged

combination was between a market participant, Speedo, and an ostensibly neutral party, USA Swimming. (*Id.* at 6.) The Court rejected the challenge, noting that the Supreme Court in *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), had recognized a species of Section 1 conspiracies involving a market participant and an ostensibly neutral party. (Docket No. 72 at 7.)

*Hydrolevel* involved an antitrust suit by a manufacturer of low-water fuel cutoffs for boilers against a nonprofit trade association which promulgated codes and standards for the industry. 456 U.S. at 558–59, 102 S.Ct. 1935. Although the association's codes and standards were only advisory, many were incorporated into federal regulations, state laws, city ordinances, and the laws of all the Provinces of Canada. *Id.* at 559, 102 S.Ct. 1935. "Obviously, if a manufacturer's product [could] not satisfy the applicable [association] code, it [would be] at a great disadvantage in the marketplace." *Id.* The association, therefore, wielded a "powerful influence" over designers of boiler systems. *Id.*

An employee of the plaintiff's competitor served on the association committee that prepared the standards for boilers. *Id.* at 560, 102 S.Ct. 1935. He conspired with the committee chairman to prepare an "unofficial communication" on association letterhead, suggesting that the plaintiffs's product failed to satisfy the association's code governing low-water fuel cutoffs. *Id.* at 560–61, 102 S.Ct. 1935. This interpretation, purportedly made by the association itself, was disseminated to potential customers, thereby discouraging the purchase of the plaintiff's product. *Id.* at 562, 102 S.Ct. 1935. The Supreme Court found that the competitor "successfully used its position with [the association] ... to thwart [the plaintiff's] competitive chal-

lenge," and held the association liable under Section 1 of the Sherman Act. *Id.*

On their motions to dismiss in this case, Defendants countered with *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir.1989), which held that a trade association's speech critical of a product does not constitute an antitrust violation absent some mechanism to actually enforce a restriction on the availability of the product. *Id.* at 399. In *Schachar*, a trade association labeled a particular eye surgery procedure per-' formed by the plaintiffs as "experimental." *Id.* at 398. However, as the court noted:

> [The association] *did not require its members to desist from performing the operation* or associating with those who do. *It did not expel or discipline or even scowl at members who performed radial keratotomies.* It did not induce hospitals to withhold permission to perform the procedure, or insurers to withhold payment; *it has no authority over hospitals, insurers, state medical societies or licensing boards,* and other persons who might be able to govern the performance of surgery.

*Id.* (emphasis added). Because the association did not attempt to use any enforcement mechanisms to prevent consumers from getting the surgery, i.e., did not restrict the supply, there was no antitrust violation, only speech. *Id.* at 399.

The distinction between *Hydrolevel* and *Schachar* is whether the association or neutral party actually attempts to enforce some standard—whether it punishes or threatens to punish a market actor for deviating from the standard. This distinction has been recognized by numerous other circuits in similar cases. *See, e.g., Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132–33 (3d Cir. 2005) (finding no antitrust violation where trade association criticized plaintiff's products, but did not coerce or restrain market

actors); *Int'l Healthcare Mgmt. v. Haw. Coal. For Health*, 332 F.3d 600, 606 (9th Cir.2003) (finding no antitrust violation from comments made by professional association where it did not act to constrain anyone to follow its advice); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 373–74 (6th Cir.2003) (finding that a professional association did not violate antitrust laws under *Hydrolevel* because, like *Schachar*, it lacked a mechanism to enforce standards); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 296 (5th Cir.1988) (finding no antitrust violation where an influential trade association delayed certification of the plaintiff's product because association did not coerce customers). It is not enough to simply point out that an association has influence over the purchasing decisions of consumers: "An organization's towering reputation does not reduce its freedom to speak out." *Schachar*, 870 F.2d at 399; *accord Consolidated Metal*, 846 F.2d at 296 ("Even if user reliance gives [the trade association] significant influence over the market, that influence may enhance, not reduce, competition and consumer welfare."). Such influence does not prevent an association from promoting a particular product, or disparaging another. *Schachar*, 870 F.2d at 400.

TYR attempts to distinguish *Schachar* and other trade association cases because USA Swimming, as an NGB, exercises "monolithic control" over its sport, *see JES Props., Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1231–31 (11th Cir.2006), unlike trade associations, which often lack comparable control over the respective trade. However, the distinction between *Hydrolevel* and *Schachar* was not the ability to restrain trade; it was that the defendant in *Hydrolevel* actually used its de facto force of law to do so.

TYR also argues that *Schachar* is inapplicable because it did not involve the "dual role" present here and in *Hydrolevel*, where an employee of a competitor also served as member or officer within the neutral NGB or trade association. The Court does not find this distinction relevant. *See Santana*, 401 F.3d at 132 (analogizing to *Schachar* where plaintiff had alleged a dual role). At most, it goes to motive, but TYR must show that Defendants actually restrained trade, not just that it wanted to.[3]

■ In short, TYR must prove actual coercion—that USA Swimming and Schubert set a standard with the threat of punishing market participants for deviating from that standard. "There can be no restraint of trade without a restraint." *Schachar*, 870 F.2d at 397. Promotion and persuasion are not actionable as antitrust violations, even where the speaker holds extraordinary prestige and influence. Such speech is just part of the "[w]arfare" of competition. *Id.* at 399.

With these principles in mind, the Court turns to TYR's evidence that Speedo, USA Swimming, and Schubert coerced elite swimmers to wear Speedo suits as opposed to those of competitors.

### i. The Beijing Olympics Comment

■ On the motion to dismiss, the Court identified a single allegation that potentially presented the necessary coercive conduct. Schubert was quoted as saying, "I would strongly advise [the swimmers] to wear the [Speedo] suit at trials, or they may end up at home watching [the Olympics] on NBC." (Complaint ¶ 16(*l*).) The Court, at that time, recognized that this statement could be interpreted in two ways: (1) a swimmer wearing a non-Speedo suit would be at a competitive disadvantage, thereby risking a loss at the Trials, or (2) Schubert would exclude a swimmer from the Olympic Team if the swimmer chose to wear a non-Speedo suit. (Docket No. 72 at 8–9.) At the pleading stage, the Court was required to accept TYR's interpretation—that the statement was a threat intended to coerce swimmers into wearing Speedo gear.

Now, on summary judgment, the Defendants have presented evidence that Schubert's statement could not possibly be interpreted as a threat because Schubert lacked the authority to exclude swimmers from the Olympic Team. First, the Defendants note that USA Swimming's Olympic International Operations Procedures Manual specifically allows swimmers to freely choose the own equipment: "Swimsuit Policy: Athletes may wear the competitive swimsuit of his/her choice." (Young Decl., Ex. D at 16.) This is consistent with the guidelines adopted by the United States Olympic Committee ("USOC"), applicable to all NGBs: "An Athlete shall have the exclusive right to select his or her Specialized Equipment for use in all Protected Competition."[4] (*Id.*, Ex. E.) Thus, at least under USA Swimming and USOC rules, Schubert lacks the authority to mandate hat a particular suit be worn by swimmers. TYR concedes as much. (Opp'n to USA Swimming 5.)

Furthermore, under the official selection procedures for the 2008 Olympic Team, Schubert had no discretion with respect to who made the Team. The only criterion for

---

**3.** The Court also notes that the plaintiffs in *Schachar* did allege a dual role: "Plaintiffs say that the Academy is in the grip of professors and practitioners who favor conservative treatment, forever calling for more research (the better to justify the academics' request for grants)." 870 F.2d at 399.

**4.** The parties do not dispute that swimsuits are "Specialized Equipment" and that the Olympic Trials and Olympic Games are "Protected Competition."

selection is the athlete's swim time at the Olympic Trials—"the wall" decides who goes to the Olympics, not the coach. (*See* Young Decl., Ex. I.) Under the selection procedures, Schubert could not exclude a TYR-sponsored swimmer whose time was fast enough to qualify, even if he wanted to. Indeed, several TYR-sponsored swimmers qualified at the Trials and swam at the Beijing Olympics. (Zimmer 9/30/09 Depo. at 113:16–25.)

Every witness deposed in this case on this issue has acknowledged that swimmers were free to wear the suit of their choice at the Olympic Trials and that Schubert had no say on who made the pool swimming team. (*See, e.g.,* Descenza Depo. at 48:14–49:7; Furniss Depo. at 148:7–13, 149:15–150:10; Van Wie Depo. at 53:24–54:4; Zimmer 9/30/09 Depo. at 204:18–205:1.) In fact, Mary Descenza ("Descenza"), a TYR-sponsored swimmer, directly told Schubert that she intended to continue wearing TYR suits, and he did not object or pressure her to change her mind. (Descenza Depo. at 60:6–61:14.)

The Defendants having shown evidence that Schubert lacks any coercive power— any means to punish non-Speedo swimmers—with respect to the composition of the Olympic Team for pool swimming, the burden falls to TYR to produce evidence rebutting the Defendants' showing. TYR concedes that it cannot make this showing, at least with respect to the pool swimmers.[5] (SGI Speedo ¶ 40.) TYR admits that the pool swimming Olympic Team is determined by who is "first to the wall."[6]

Instead, TYR notes that Schubert has discretion to choose swimmers for the open water swimming Olympic Team, which is not governed by the same "first to the wall" rule. Therefore, TYR argues, Schubert's statement could reasonably be interpreted as a threat to open water swimmers hoping to make the Olympics. Putting aside the fact that Schubert's comment was made within the context of a pool swim meet, the actual selection of the open water team belies TYR's claim of coercion. Schubert and Bill Rose, the TYR-sponsored head coach of the open water team, chose Chloe Sutton to represent the United States in Beijing over Micha Burden. (Rose Decl. 19.) Both swimmers wore TYR suits.[7] (*Id.* ¶ 5.) Although Burden bested Sutton at the Trials, Burden failed to qualify for the Olympics at an international qualifying competition, placing 31st. (*Id.* ¶¶ 4, 8.) Rose, who was the personal coach of both Burden and Sutton, told Schubert that he felt that Sutton had the best chance to succeed in Beijing. (*Id.* ¶¶ 9.) There is no evidence that suit choice played a role, or that either swimmer was pressured or coerced by Schubert to wear Speedo.[8]

Considering the above evidence, Schubert's statement that swimmers not wearing the Speedo suit "may end up at home watching [the Olympics] on NBC," cannot be reasonably interpreted as a threat to exclude swimmers who did not wear Speedo. The evidence establishes that Schubert did not have such authority, that the swimmers and other relevant persons un-

---

**5.** However, TYR points out that an extra swimmer was added as an alternate, even though she had not qualified based on her time at the Trials. (SGI Speedo ¶ 40.)

**6.** TYR offers the argument that Schubert could influence who reached the wall first through psychological means by "planting in swimmers' minds that the [Speedo suit] is superior and that other suits are inferior."

(Opp'n to Speedo 7–8.) This supposed psychological trick does not constitute coercion in any sense of the word.

**7.** Burden was sponsored by TYR and Sutton was an amateur who chose to wear TYR.

**8.** A swimmer for the men's open water team was also sponsored by TYR. (Zimmer Depo. at 113:16–21.)

derstood that Schubert did not have such authority, and that TYR-sponsored swimmers made the U.S. team and competed in Beijing. There is no triable issue of fact as to whether Schubert's statement constituted an unlawful restraint of trade.

### ii. Schubert's Attempts to Persuade Elite Swimmers

TYR argues that Schubert restrained trade by attempting to persuade several elite swimmers to wear Speedo suits from his position of "extraordinary influence." However, as discussed above, statements from a position of influence alone do not constitute "restraints." A person or organization having prestige or respect does not lose the right to promote or criticize products in the marketplace. A statement must set some standard backed by a threat to punish to be actionable as an antitrust violation.

TYR points to several instances of Schubert attempting to persuade swimmers to switch to Speedo. At the Junior Pan Pacific meet in January 2009, Schubert approached Patrick Murphy ("Murphy") and Nick D'Innocenzo ("D'Innocenzo"), two swimmers on the Junior National Team who wore non-Speedo suits.[9] (King Depo. at 13:8–12, 16:6–17:1, 18:3–20:21.) Schubert "suggested in a roundabout sort of way that [the LZR Racer] was the best suit to wear, the fastest suit or the faster suit out of the suits that the boys were wearing." (Id. at 18:25–19:2.) Both swimmers subsequently switched to the LZR Racer. (Id. at 23:7–24:2.) However, Murphy immediately switched back to his TYR suit after a single race, as he did not like the feel of the LZR Racer.[10] (Id. at 24:25–25:10, 61:6–23.) TYR emphasizes that Brian King ("King"), Murphy's coach, said that Murphy "said he felt that he had to wear the LZR suit and would do it, but he didn't want to."[11] (Id. at 24:17–19.)

■ Schubert's statement to Murphy and D'Innocenzo that the Speedo suit was "faster" is not a restraint on trade. Schubert did not threaten to take any action against them if they chose not to wear Speedo and, as far as the record shows, no action was taken when Murphy did not so chose. Murphy continued to wear the TYR suit, after one go with the LZR, without repercussion. That Murphy felt pressured to wear the suit after Schubert's comments does not evidence the impropriety of Schubert's actions. Murphy did not explain why he felt pressured—whether it was pressure to conform, awe of the National Team head coach, or some other pressure—and he clearly felt free to disregard the LZR after one race. Schubert's "faster" comment was simply promotion of Speedo's product, which Schubert is entitled to do regardless of how influential he is within the swimming community.

Later in the meet, Schubert told King that Murphy was not allowed to wear his TYR swim cap at the meet and had to wear the National Team cap, which had a Speedo logo. (Id. at 20:25–22:2.) However, Schubert's objection was due to the fact that Murphy's personal cap had his name on it, which, according to Schubert, was against team rules. (Id. at 53:20–54:24.) This does not establish that Murphy was coerced to wear a Speedo swimsuit.[12]

---

**9.** Murphy wore a TYR and D'Innocenzo wore a Blue 70 suit. (King Depo. at 19:3–4.)

**10.** The record is silent on whether D'Innocenzo stuck with the Speedo suit.

**11.** This testimony presents an obvious hearsay problem and may not be admissible at trial. Fed.R.Evid. 801(c).

**12.** In any case, Murphy disobeyed Schubert and wore his personal TYR cap for the Remainder for the meet, apparently without punishment. (King Depo. at 55:4–19.)

TYR also points out efforts by Schubert to convince swimmers sponsored by Nike, including Jason Lezak, Brendan Hansen, Aaron Peirsol, Cullen Jones, and Kaitlin Sandeno to wear Speedo suits at the Beijing Games. (Young Decl., Ex. K ¶ 12–14.) Again, however, TYR fails to point to any threat Schubert made. Without a threat, Schubert's statements constitute mere promotion, not coercion.

TYR presents evidence that a Romanian swimmer, Razvan Florea, switched from TYR to a Speedo suit because of Schubert's comments about the LZR Racer's superior performance. (Florea Decl. ¶¶ 5–6.) TYR fails to explain how Schubert or USA Swimming could have any enforcement power against a Romanian swimmer.

Finally, TYR points to the Manchester National Team meeting where Schubert touted the advantages of the latest Speedo suit.[13] Descenza, one of the swimmers at the meeting, testified that Schubert "tried to make a very highly persuasive case and influence. He does have a lot of influence over swimmers because he is such a prominent figure in USA swimming." (Descenza Depo. at 19:23–20:1.) Two other swimmers tried the Speedo suit after the meeting. (Marshall Depo. at 56:11–13; Van Wie Depo. at 16:14–15.) Again, Schubert's statements at the meeting do not establish coercion. Schubert tried to be persuasive, tried to convince swimmers to test the suit, but nothing indicates that he ever attempted to constrain their choice. His prominence within the swimming community does not lessen his ability to legally promote Speedo's product.

### iii. Athlete Compensation & Non–Olympic Competitions

In their attempt to establish that Schubert could coerce swimmers to wear Speedo, TYR points to all the discretionary power Schubert has to potentially punish swimmers: (1) he has access to a discretionary fund to pay swimmers; (2) he can choose which swimmers compete on the relays in competition;[14] (3) he has discretion to designate certain swim clubs as "Post–Graduate Training Centers," entitling them to funding from USA Swimming and the USOC; and (4) he has the power to choose swimmers for certain non-Olympic Events, such as the "Duel in the Pool."

The problem is that TYR has failed to connect any threat made by Schubert to the hypothetical powers to punish. It is not enough to show that Schubert *could* restrain trade—TYR must come forward with evidence that he actually did so. The only potential threat Schubert made was regarding a spot on the Olympic Team. However, as discussed above, Schubert lacked the authority to follow through on the supposed threat. All of the other actions identified by TYR constitute mere promotion—statements to swimmers that the Speedo suit was faster or provided an advantage. TYR has failed to identify any evidence demonstrating that Schubert threatened, even implicitly, to use his discretionary powers to punish a swimmer for not wearing Speedo.

### iv. Research Collaboration

■ TYR also argues that Speedo, USA Swimming, and Schubert restrained trade by collaborating to develop faster swimwear, to the exclusion of Speedo's competitors. TYR cites no authority that such collaboration violates antitrust laws. A joint research venture alone does not violate the antitrust laws. *See United States v. Line Material Co.*, 333 U.S. 287, 310, 68

---

**13.** The parties dispute whether Schubert was referring to an advantage the LZR Racer had over the old Speedo suit, the FS Pro, or over all suits currently in the marketplace.

**14.** The swimmers sometimes receive bonuses from sponsors for being chosen to the relay team. (*See, e.g.,* TYR Exs. 18 at 18, 19 at Ex. A.)

S.Ct. 550, 92 L.Ed. 701 (1948); *see also* 15 U.S.C. § 4302 ("In any action under the antitrust laws ... the conduct of any person in making or performing a contract to carry out a joint venture ... shall not be deemed illegal per se."). This is particularly true where one of the collaborators, USA Swimming, is not even a market participant. TYR has pointed to no anticompetitive effect of the joint research project. Indeed, such joint research is likely to have many procompetitive effects.[15]

■ Nor does the fact that USA Swimming kept information gleaned from the collaboration secret demonstrate a restraint of trade. Secrecy is a necessary part of the collaboration; if the results were immediately made public, the manufacturer would have no incentive to expend the time and effort to collaborate with an NGB on research, an activity potentially beneficial to competition. Manufacturers are not required to be altruistic when working in a joint venture with a nonprofit.

*v. Schubert's Role as Technical Advisor*

Finally, TYR complains of Schubert's role within USA Swimming to disseminate technical information to the public. TYR argues that Schubert, as a "gatekeeper," only disseminated information favorable to Speedo, misstated information, and withheld information unfavorable to Speedo and favorable to Speedo's competitors.

These complaints do not make out a claim of coercion. The antitrust laws do not require an ostensibly neutral party to praise competitors equally or to refrain from disparaging a competitor, subject to the limits discussed below with regard to TYR's disparagement theory. *See Schachar*, 870 F.2d at 399.

Because TYR has failed to show a genuine issue of fact with regard to coercion, the Defendants are entitled to summary adjudication on that issue. Fed.R.Civ.P. 56(d). While not agreeing with the Court's application of *Schachar*, TYR conceded at oral argument that the Defendants were entitled to this relief on its compulsion theory.

#### 2. *Disparagement*

■ At the hearing, TYR argued that the Defendants had not addressed TYR's disparagement theory of antitrust liability and therefore failed to carry their initial burden under *Celotex* of demonstrating the absence of a genuine issue of material fact as to an essential element of TYR's claim. 477 U.S. at 323, 106 S.Ct. 2548. This argument was not specifically advanced in either of TYR's opposition briefs. It was, however, alluded to in the opposition to USA Swimming and Schubert's motion.[16]

The Defendants argue that, because they moved for summary judgment on the entire claim, the burden shifted to TYR to raise a genuine issue of material fact; in

---

**15.** The combination of resources and expertise of USA Swimming and Speedo is likely to help innovation in swimsuit technology, thereby benefitting the consumer.

**16.** "USA Swimming and Schubert misread the [Court's order on the motions to dismiss] (and the referenced authorities), and they fundamentally mischaracterize—i.e., narrow the focus—of the allegations and evidence establishing defendants' coordinated anti-competitive conduct. USA Swimming and Schubert try to cast TYR's claims as limited to the 2008 Olympic team and limited to the rules regard-

ing swimwear of choice. However, the anticompetitive conduct shown by TYR is much broader: it predates the Olympics by more than a year and encompasses behavior unrelated to team selection and technical equipment rules. Put in summary judgment parlance, USA Swimming and Schubert fail to meet their burden of negating an essential element of TYR's claims or demonstrating an absence of evidence supporting them because they miscast them in the narrow range they think falls within the 'undisputed evidence.' " (Opp'n to USA Swimming 13.)

this case, to raise their alternative theory of antitrust liability. However, TYR was not obligated to produce anything unless and until the Defendants carried their initial *Celotex* burden. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce *anything*, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102–03 (emphasis added). By failing to squarely address TYR's disparagement theory, the Defendants have not carried their initial *Celotex* burden. Thus, TYR's burden of production with regard to the disparagement theory was never triggered.

This is not a new theory raised for the first time to prevent or delay summary judgment. TYR's Complaint specifically alleges that the Defendants engaged in a campaign of false disparagement using the prestige and apparent impartiality of USA Swimming and Schubert. (Compl.¶¶ 13–17.) The disparagement theory was also squarely addressed following the motions to dismiss, as evidenced by the Court's discussion of *American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal*, 108 F.3d 1147 (9th Cir.1997), in denying dismissal of TYR's disparagement claim. (Docket No. 72 at 10.) By completely failing to address a live issue, the Defendants failed to carry their *Celotex* burden.

█ Nor has TYR waived its argument by saving it for the hearing. Although the Court has discretion to refuse to consider arguments not raised in a timely manner, *see, e.g., Brass v. County of Los Angeles*, 328 F.3d 1192, 1197–98 (9th Cir.2003), the Court does not consider the argument waived here, where the disparagement theory is clearly set forth in the pleadings, remained a live issue following the Court's order on the motions to dismiss, and is alluded to—albeit rather obliquely—in TYR's opposition papers. *Cf. United States v. Fay*, 545 F.Supp.2d 1067, 1071 (E.D.Cal.2008) ("[T]here are cases where the Ninth Circuit has found no waiver if the issue was at least minimally raised in the pleadings and developed at oral argument....").

The Defendants also argue that the disparagement claim fails because TYR lacks evidence demonstrating that elite swimmers or consumers were ever restrained from purchasing TYR products. However, an antitrust disparagement claim in the Ninth Circuit does not depend on actual coercion or restraints on consumers. It stems from the recognition that "[f]alse statements about rivals can obstruct competition and possess no off-setting redeeming virtues," even if consumers are not actually constrained in their purchasing decisions. *See Harcourt Brace*, 108 F.3d at 1152 (quoting 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 737b at 280–81 (1978)).

Accordingly, the Defendants are not entitled to summary judgment on TYR's antitrust claims to the extent they rely on a disparagement theory.

### 3. *Illegal Agreement*

The Defendants contend that TYR's Sherman Act § 1 and Cartwright Act claims fail because they lack evidence of an illegal agreement. Relying on *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) and *Matsushita*, the Defendants argue TYR fails to raise a triable issue of fact as to whether the various agreements between Speedo, USA Swimming, and Schubert are illegal, because those agreements are entirely consistent with legal sponsorship agreements.

The Defendants misapply the holdings of *Monsanto* and *Matsushita*. These cases stand for the proposition that, in an antitrust conspiracy case, one cannot reasonably infer a combination or conspiracy

solely from conduct that is consistent with *independent* action, without additional evidence of an actual agreement. *See Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348; *Monsanto,* 465 U.S. at 763–64, 104 S.Ct. 1464. Here, in contrast, there is unquestionably evidence of an agreement between the parties. TYR need not rely on an inference from circumstantial evidence consistent with independent competition.

#### 4. *Market Definition*

Finally, the Defendants argue that they are entitled to summary judgment because TYR cannot show a genuine issue of fact as to the relevant geographic market. TYR alleges a market for "high-end competitive swimwear and accessories" in the geographic market of "the entire United States and its territories." (Compl.¶ 9.)

The relevant geographic market is the "area of effective competition . . . where buyers can turn for alternate sources of supply." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1490 (9th Cir.1991) (citation and quotation marks omitted). It can be demonstrated by the existence of certain barriers to entry, or insulation from a larger geographic market, such that supply and demand are inelastic with the larger market. *Id.* The boundaries of a market can also be shown by "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Image Tech. Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1204 (9th Cir.1997) (quoting *Brown Shoe Co. v. United States,* 370 U.S.

294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Market definition is generally a factual determination left to the jury. *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1476 (9th Cir.1997).

TYR has sufficient evidence of the United States as a separate geographic market to overcome summary judgment on the issue. Internal emails and memos at both Speedo and USA Swimming indicate that they consider the United States market as distinct from the international market. (TYR Exs. 37–39.) Steve Furniss ("Furniss"), the Executive Vice President of TYR and who has worked for 34 years in the performance swimwear industry, testified as to numerous barriers to competition:[17] (1) the ability to provide local technical support; (2) on-the-ground customer service networks able to quickly respond to the needs of elite swim teams; (3) relationships with athletes, coaches, and swim directors; (4) cultural differences in suit preferences; (5) differences in the physiology of swimmers from country to country; (6) differences in sizing and labeling requirements; (7) differences in local regulations regarding consumer protections, packaging, and the environment; and (8) differences in currency and pricing. (Furniss Decl. ¶¶ 4–6.)

Accordingly, the Court finds that the Defendants are entitled to summary adjudication on the issue of antitrust coercion, but not on TYR's antitrust theory of antitrust disparagement.

### B. *False Advertising Claim* (Fourth Claim)

Speedo seeks summary judgment on TYR's false advertising claim under the

---

**17.** Speedo, citing *Morgan,* objects to Furniss's declaration on the grounds that it is impermissible lay witness testimony on the technical subject of the relevant geographic market. *See* 924 F.2d at 1490. This objection is overruled because Furniss testifies only as to factual characteristics of the geographic market, which is within his competency as an industry veteran. He does not give a conclusory opinion on market definition, unlike the witnesses in *Morgan. See id.*

Lanham Act. TYR's false claims are based on two statements made by Schubert: (1) a statement he made to swimmers and a reporter at a swim meet, that the LZR suit offered "a 2% advantage"; and (2) a statement to two youth swimmers that the LZR suit was "faster" than their non-Speedo suits.

■ For a prima facie case under the Lanham Act, the plaintiff must demonstrate the following: "(1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in commercial advertisement or promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir.2008) (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002)).

### 1. *Schubert's Statements to Swimmers*

Speedo argues that, even assuming that Schubert's statement can be proven false or misleading, TYR cannot demonstrate injury. His statement at the Manchester swim meet was to an audience of 25 swimmers, only one of whom switched from a wearing TYR to a Speedo on a regular basis.[18] (Kerska Decl. ¶¶ 1–4; Carroll Decl. ¶¶ 4–16.) The one swimmer who switched, Katie Carroll, did so months later at the Olympic Trials after she had swam a poor first race in her TYR Tracer

Rise suit. (Carroll Decl. ¶¶ 11–15.) She testified that Schubert's 2% comment had nothing to do with her decision. (*Id.* ¶ 13.)

Schubert's statement to the two youth swimmers, Murphy and D'Innocenzo, similarly failed to result in lost sales to TYR. Murphy tried the LZR Racer for one race and then switched back to the TYR suit, because he did not like the feel of the Speedo suit. (King Decl. at 24:25–25:10, 61:6–23.) D'Innocenzo was not a TYR customer and, instead, wore a Blue 70 suit. (*Id.* at 19:3.)

■ TYR contends that it need not prove injury because Schubert's statements were literally false. In the Ninth Circuit, "[p]ublication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir.1997) (quoting *U–Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040–41 (9th Cir.1986)). The presumption, however, is of "deception and reliance," i.e., causation, not injury. The presumption does not cure TYR's failure to show evidence of any actual loss of sales.

Moreover, the presumption is rebuttable. *See Jartran*, 793 F.2d at 1041. The only injury fairly traceable to Schubert's comments was Carroll's defection to Speedo several months after the Manchester comments. However, Carroll specifically stated that her choice to switch sponsors had nothing to do with Schubert's comments. TYR has no evidence rebutting this testimony. *Cf. Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir.1996) ("To avoid summary judgment, [the plaintiff] must do more than establish a prima facie case and deny the credibility of the

---

**18.** At the elite level, most swimmers are sponsored by a swimwear company and do not purchase their own suits.

[defendant's] witnesses. She must produce specific, substantial evidence [rebutting defendant's evidence].")

Finally, any claim for injunctive relief under the Lanham Act is moot, as it is undisputed that there is no market for the high-performance swimsuits among elite swimmers following FINA's ban.

Because TYR cannot demonstrate injury based on Schubert's statement at the Manchester meet and the statements to Murphy and D'Innocenzo, TYR's Lanham Act claim based on those statements fails as a matter of law.

### 2. *Schubert's Statement to Craig Lord*

■■ Speedo argues that Schubert's claim of a 2% advantage made to swim reporter Craig Lord ("Lord") cannot constitute a Lanham Act violation because it is not "commercial advertising or promotion." To constitute commercial advertising, a statement must be: (1) commercial speech; (2) intended to influence consumers to buy defendant's goods or services; and (3) disseminated sufficiently to the relevant purchasing public. *Boule v. Hutton,* 328 F.3d 84 (2d Cir.2003).

Speedo, citing *Boule,* contends that Schubert's statement to Lord fails the first prong because the statement was made to the press about a matter of public concern. In *Boule,* the defendants, son and daughter-in-law of the late Russian avant garde painter Lazar Khidekel, made statements to an art reporter questioning the authenticity of the plaintiffs' Khidekel collection. *Id.* at 86, 88. At the time, the defendants were attempting to sell their own collection of Khidekel works. *Id.* at 87. The statements were quoted in the reporter's magazine article about fraudulent artwork. *Id.* at 88.

The Second Circuit found that the statements in the magazine article did not constitute commercial speech:

We have little hesitation in deciding that as a matter of law the [magazine] article, and the [defendants'] statements quoted in that article, are not commercial speech. The article itself addresses a matter of public concern—fraud in the art market—and is certainly protected. The [defendants'] statements contained in the article are inextricably intertwined with the reporters' coverage of their topic. The statements by the [defendants] in [the magazine] contribute to reporters' discussion of an issue of public importance and occur in a forum that has traditionally been granted full protection under the First Amendment. As always with the public expression of opinion, "we have been careful not to permit overextension of the Lanham Act to intrude on First Amendment values." Consequently, the defendants were entitled to a grant of summary judgment on that portion of the Lanham Act claim that addressed the statements by the [defendants] in [the magazine].

*Id.* at 91–92 (footnote and citation omitted).

Likewise, Lord's article in SwimNews.com addressed a matter of public concern; namely, the public debate, "confusion, doubt and denial" about the effect of Speedo's new high-performance suit on the performance of swimmers. (Young Decl., Ex. O.) The article is clearly protected speech. And like the defendants' statements in *Boule,* Schubert's statement regarding the performance of athletes in the Speedo LZR Racer is "inextricably intertwined with the reporter['s] coverage of [the] topic." *See* 328 F.3d at 91. As such, under *Boule,* Schubert's statement to Lord cannot constitute a Lanham Act violation.

In its opposition brief, TYR did not address *Boule* or the statement to Lord, apparently conceding that it does not constitute commercial speech actionable under the Lanham Act. Accordingly, Speedo is entitled to summary judgment on TYR's fourth claim.[19]

**19.** The Court does not reach the question of whether Schubert's statement can be proven

literally false.

## C. *Intentional Interference with Contractual Relations* (Sixth Claim)

TYR's tortious interference with contractual relations claim is predicated on the termination of the endorsement deal between TYR and swimmer Erik Vendt. During his endorsement deal with TYR, Vendt decided to wear a Speedo suit at a swim meet. TYR canceled his endorsement deal in response.

 The elements of a tortious interference with contractual relations claim are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990).

The Defendants contend that they cannot be liable because (1) TYR, not Vendt, breached the contract, and (2) TYR has not demonstrated an intentional act on the part of any of the Defendants "designed to induce a breach or disruption." The Court need not reach the breach of contract issue, because TYR does not have sufficient evidence to create a triable issue of fact as to whether any of the Defendants intentionally induced Vendt to breach or disrupt his relationship with TYR.[20]

TYR admits that it does not have direct evidence that the Defendants induced Vendt to breach. However, it points to circumstantial evidence that it claims raises a triable issue of fact as to whether Schubert and Stu Isaac ("Isaac"), a Speedo-sponsored swim coach, induced Vendt to terminate his contract with TYR.

Schubert testified that Vendt called him several times in the fall of 2007 to complain about his TYR suits. (Schubert Depo. at 213:9–215:23.) He also testified that he told Vendt to talk to his agent and communicate his dissatisfaction directly to TYR. (*Id.* at 214:6–7, 215:4–6.) Vendt, however, stated in an interrogatory response that he never discussed his TYR suits with Schubert. (TYR Ex. 47 at 2.) When pressed at a deposition, he stated that he did not recall discussing TYR suits with Schubert in 2007, but that he may have around March 2008.[21] (Vendt Depo. 148:24–149:18.)

TYR contends that a reasonable jury could find that during the calls in fall 2007, Schubert urged Vendt to end his relationship with TYR based on the following facts: (1) Vendt's evasiveness during discovery regarding the calls; (2) Schubert's public comments urging swimmers to use the LZR Racer; (3) that Schubert used money from his discretionary account to pay Vendt after TYR canceled the contract; (4) Schubert's failed negotiations with TYR for an endorsement deal in 2004; and (5) the fact that Vendt claimed to have secured an endorsement deal with Speedo after TYR canceled his deal.

 This circumstantial evidence is insufficient to create a triable issue of fact. First, it is undisputed that Vendt initiated the calls to Schubert, not vice versa. This

---

**20.** It is worth noting that it appears that TYR terminated Vendt—not vice versa. (*See* TYR Ex. 45.) TYR's action was predicated on Vendt's choice to wear a competitor's suit, but he appears to have had a unilateral contractual right to do so. (Speedo Ex. 283 § 3.5.)

**21.** Vendt's testimony is unclear as to whether the March 2008 calls were with TYR or Schubert; Vendt appears to have been confused by the question. (*See* Vendt Depo. at 149:2–12.). However, the Court accepts TYR's interpretation for summary judgment purposes.

is, of course, not dispositive, but certainly weighs heavily against the notion that Schubert acted to intentionally induce Vendt to switch vendors.

Second, Schubert's public promotion of Speedo products does not establish that he ever urged a swimmer to breach an endorsement deal. It would be unreasonable to infer that Schubert privately urged Vendt to withhold performance of the endorsement deal from his public comments promoting Speedo.

Finally, the remaining evidence is too tenuous to establish a genuine issue of fact. The Court fails to see how *Vendt's* evasiveness establishes *Schubert's* intentional tortious conduct, especially given that Schubert himself appears to have been entirely forthcoming about the calls. The actions taken by Schubert and Speedo after the Vendt lost his TYR deal shed little light on their actions before.[22] And Schubert's alleged motive to injure TYR because of the failure to secure a TYR endorsement deal in 2004 is far too tenuous to provide any significant probative value.

TYR also points to a meeting Vendt allegedly had with Isaac, his Speedo-sponsored coach at Club Wolverine. Vendt testified that he had visited Isaac's home several times, but only when Isaac was not there—Vendt's girlfriend at the time was good friends with Isaac's wife. (Vendt Depo. at 96:7–12.) TYR contends that this is inconsistent with Isaac's testimony that

Vendt and his girlfriend once came over to cook a turkey for Thanksgiving. (Isaac Depo. at 227:1–11.) However, Isaac's testimony does not, in fact, establish that he was there or met with Vendt at that time.[23] In any case, nothing indicates that swimsuits were ever discussed.

To overcome summary judgment, TYR needs to show more than a scintilla of evidence. But that is all they have here; disconnected bits of circumstantial evidence. Even if those bits are summed, no reasonable jury could find by a preponderance of the evidence that Schubert or Isaac intentionally induced Vendt to breach his contractual relationship with TYR. Therefore, the defendants are entitled to summary judgment on TYR's Sixth claim.

### D. *Remaining State Law Claims* (Ninth and Tenth Claims)

The Defendants argue that TYR's UCL claim fails because it is predicated on the TYR's other causes of action. However, because TYR's antitrust disparagement claim survives, TYR can base its UCL claim on the Defendants' alleged "unlawful" business practices constituting violating the Sherman Act and the Cartwright Act, and "unfair" business practices that "threaten[ ] an incipient violation of an antitrust law, or violate[ ] the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threat-

---

22. This is especially true given that Schubert did not use his discretionary fund to pay Vendt until April 2008, roughly three months after TYR canceled his endorsement deal. (Schubert Depo. at 218:22–219:3.) And although Vendt claimed to have a Speedo deal in March 2008, (Vendt Depo., Ex. 295), Speedo did not propose a sponsorship deal until May 2008, four months after the end of his TYR deal, and, because of this lawsuit, no deal was ever reached. (Supp. Isaac Decl. ¶¶ 4–6.)

23. "I do believe that one time over a Thanksgiving [Vendt and his girlfriend, Kim] . . . wanted to try to roast a turkey for the first time in their lives, and they brought a turkey over. And my wife helped them, and even went back to their apartment to help them finish off cooking the turkey. *I was not involved in that process, thank goodness.*" (Isaac Depo. 227:4–11 (emphasis added).)

ens or harms competition." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal.4th 163, 187, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999).

TYR's tenth claim seeks only injunctive relief and does not state an independent cause of action. However, because TYR's antitrust claims and UCL claim survive summary judgment, TYR's claim for injunctive relief remains as well.

## IV. *CONCLUSION*

For the foregoing reasons, the motions for summary judgment are GRANTED in part and DENIED in part. Speedo is entitled to summary judgment with respect to TYR's Fourth and Sixth Claims, and USA Swimming and Schubert are entitled to summary judgment on TYR's Sixth Claim. Speedo, USA Swimming, and Schubert are entitled to summary adjudication on the remaining claims to the extent they rely on a coercion theory of antitrust liability.

As noted above, the Court concludes that the Defendants failed to carry their initial *Celotex* burden with respect to TYR's theory of antitrust liability for disparagement. However, the case law imposes a high burden before speech in the marketplace becomes actionable antitrust conduct. Such statements "must have a significant and enduring adverse impact on competition itself in the relevant markets to rise to the level of an antitrust violation." *Harcourt Brace,* 108 F.3d at 1152. In fact, the Ninth Circuit "insist[s] on a preliminary showing of significant and more-than-temporary harmful effects on competition (and not merely upon a competitor or customer)." *Id.* at 1151 (internal quotation marks omitted).

The Court believes that the issue of the requisite preliminary showing should be tested before the matter proceeds to trial. To that end, the Court is willing to entertain a further summary judgment motion, even if that requires a slightly collapsed motions schedule [24] or a brief delay in the trial. The Court schedules a telephonic status conference for March 8, 2010 at 11:00 a.m. to discuss the issue.

IT IS SO ORDERED.

---

**24.** The combination of Rule 56(c) of the Federal Rules of Civil Procedure and the Local Rules results in a minimum 49–day motions cycle.